IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**BETTY J. ROYBAL,**

  **Plaintiff,**

vs.            No. CIV 00-1461 JP/LCS

**KENNETH S. APFEL,**
**COMMISSIONER OF SOCIAL SECURITY,**

  **Defendant.**

## MAGISTRATE JUDGE'S PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

  **THIS MATTER** came before the Court upon Plaintiff's Motion to Reverse and Remand (Doc. 6), filed August 22, 2000. The Commissioner of Social Security issued a final decision denying Plaintiff's application for disability insurance benefits. The United States Magistrate Judge, having considered the Motion, the memoranda submitted by the parties, the administrative record and the applicable law, finds that the motion is well-taken and recommends that it be **GRANTED**.

### PROPOSED FINDINGS

  1.  Plaintiff, now fifty years old, filed her application for disability insurance benefits on December 19, 1994, alleging disability commencing March 26, 1994, due to residual back pain and limitations resulting from a motor vehicle accident. (R. at 40-42; 45; 58.) She has an eleventh grade education, a GED, and some beauty school training. (R. at 189.) Her past relevant work was as a nursing assistant, unit secretary, dental assistant, and cosmetologist. (R. at 146.) Plaintiff's disability insured status expired on September 30, 1995. (R. at 64.)

2.	Plaintiff's application for disability insurance benefits was denied at the initial level on February 7, 1995, (R. at 43-51), and at the reconsideration level on April 11,1995. (R. at 59-61.) Plaintiff appealed the denial of her applications by filing a Request for Hearing by Administrative Law Judge (ALJ) on April 26, 1995. (R. at 62-63.) ALJ Vanderhoof held a hearing on November 21, 1995, at which Plaintiff and her husband testified. (R. at 186.)

3.	ALJ Vanderhoof issued his decision on March 8, 1996, determining that Plaintiff had the residual functional capacity for the full range of sedentary work and, thus, she was not disabled at step five based on the Grids. (R. at 22-33.) Plaintiff filed a request for review and submitted additional evidence to the Appeals Council, (R. at 6-13), which was denied on November 14, 1997. (R. at 3-4.) Plaintiff appealed to this Court. (R. at 255-57). The Commissioner filed a Motion to Remand pursuant to sentence four of the Social Security Act, 42 U.S.C.§ 405(g), for the ALJ to reevaluate the evidence including the new evidence submitted to the Appeal Council and analyze Plaintiff subjective pain complaints in accordance with *Luna v. Bowen*, 834 F. 2d 161 (10th Cir. 1987). (R. at 263-64.) On September 1, 1998, this Court granted the Commissioner's Motion. (R. at 265-66.)

4.	On remand, ALJ Johnson held a supplemental hearing on March 4, 1999, at which Plaintiff appeared and was represented by a non-attorney. (R. at 230.) On May 19, 1999, ALJ Johnson issued his decision analyzing Plaintiff's claim according to the sequential analysis set forth in 20 C.F.R. § 404.1520(a)-(f) and *Thompson v. Sullivan,* 987 F. 2d 1482, 1487 (10th Cir. 1993), and concluding that Plaintiff was not disabled at step four. (R. at 226-228.) ALJ Johnson determined that Plaintiff met the disability insured status requirements through September 30, 1995. (R. at 226.) At the first step of the sequential evaluation process, the ALJ Johnson found that Plaintiff had not

engaged in substantial gainful activity since her alleged onset date of March 26, 1994. (R. at 32.) At step two, ALJ Johnson determined that Plaintiff had the severe impairments of consisting of a failed laminectomy for herniated pulposus at L4-5, stiffness in her low back, right hip pain and residuals of a sprain/strain of the neck. (*Id*.)  At step three, ALJ Johnson found that the severity of Plaintiff's impairments had not met or equaled any of the impairments found in the Listing of Impairments, Appendix 1 to Subpart P, 20 C.F.R. §§ 404.1501-.1599. (*Id*.)

5. ALJ Johnson determined that Plaintiff had symptom producing medical problems but that she exaggerated her symptoms and functional limitations, (R. at 227), and that she had the residual functional capacity (RFC) for a full range of sedentary work. (*Id*.)  At step four, ALJ Johnson determined that Plaintiff's RFC was sufficient to perform her past relevant work as a dental receptionist and secretary, as those positions are generally performed in the national economy. Thus, ALJ Johnson concluded that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 33.)

6. Plaintiff filed a request for review of ALJ Johnson's decision, (R. at 217-220), and submitted additional evidence to the Appeals Council. (R. at 214-216)  On August 19, 2000, the Appeals Council found that the additional evidence did not relate to the relevant period and denied the request for review. (R. at 211-212.)   Hence, the decision of the ALJ became the final decision of the Commissioner for judicial review purposes.  On October 19, 2000, Plaintiff filed this action, seeking judicial review of the Commissioner's final decision pursuant to 42 U.S.C. §405(g).

**Standard of Review**

7. The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether he applied correct legal standards.

*See Hamilton v. Secretary of Health and Human Services,* 961 F.2d 1495, 1497-98 (10th Cir. 1992). Evidence is substantial if "a reasonable mind might accept [it] as adequate to support a conclusion." *Andrade v. Secretary of Health and Human Svcs.*, 985 F.2d 1045, 1047 (10th Cir. 1993) (quoting *Broadbent v. Harris*, 698 F.2d 407, 414 (10th Cir. 1983) (citation omitted)). A decision of an ALJ is not supported by substantial evidence if the evidence supporting the decision is overwhelmed by other evidence on the record. *See Gossett v. Bowen*, 862 F.2d 802, 805 (10th Cir. 1988).

8. In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity. *See Thompson v. Sullivan*, 987 F. 2d 1482, 1486 (10th Cir. 1993) (citing 42 U.S.C. § 423(d)(1)(A)). The Commissioner employs a sequential evaluation process to determine whether a claimant is disabled.

9. At the first four levels of the sequential evaluation process, the claimant must show that she is not engaged in substantial gainful employment, she has an impairment or combination of impairments severe enough to limit her ability to do basic work activities, and her impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or she is unable to perform work she had done in the past. 20 C.F.R. §§ 404.1520 and 416.920. At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering her residual functional capacity, age, education, and prior work experience. *See id.*

**Administrative Record**

10. On March 26, 1994, Plaintiff was involved in an automobile accident, sustaining a

whiplash injury. (R. at 131.) On April 8, 1994, Plaintiff presented to Dr. William Levitt, D.O. with complaints of continuing and increasing severity and frequency of headaches, neck pain, back pain, muscle spasms, stiffness, dizziness, difficulty sleeping, numbness, and tingling in both arms. (R. at 131-132.) A spine x-ray was essentially normal  (R. at 134.)  Dr. Levitt diagnosed cervical strain/sprain with restricted cervical motion, thoracic strain/sprain with restricted cervical motion, post-concussional cephalalia, myositis, somatic dysfunctions, point tenderness, and muscle spasms of the cervical and dorsal spine. (R. at 132.) Dr. Levitt prescribed osteopathic manipulative therapy and pain medication. (*Id.*) On June 22, 1994, Dr. Levitt administered an epidural steroid injection. (R. at 95.) Plaintiff underwent physical therapy beginning on May 2, 1994 (R. at 92-94), but reported little improvement. (R. at 96.) Dr. Leyba administered epidural blocks, but they failed to alleviate the pain. (R. at 102; 108.)

11.     On June 30, 1994, Plaintiff presented to Dr. George R. Swajian, D.O. for evaluation. (R. at 107.) Dr. Swajian noted that Plaintiff complained of severe pain in the cervical dorsal area, radiating in the mid-scapular area to both shoulders, and severe pain in the low back, with radiation in the left gluteal to the left thigh traveling down the back of the left thigh to the calf and the left foot with paresthesias in the left big toe. (*Id.*) Plaintiff also reported aching and soreness in her right lower leg and difficulty walking. (*Id.*)

12.     A CT scan revealed a substantial bulge through L4 and L4-5, extending into the left inferior neuroforaminotomy and degenerative changes at L5-S1. (R. at 97; 101; 109.) Dr. Swajian observed diminished Achilles reflexes on the left, bilateral sensory loss of the left foot, and radiculitis, (R. at 97; 101), which he found to be substantiated by the L4-5 bulging on the CT scan. (R. at 109.) After the evaluation, Dr. Swajian suggested that Plaintiff undergo hospitalization for pelvic traction

and additional testing in the form of an MRI and EMG tests, and possibly a lumbar myelogram and CT scan with contrast. (R. at 110.) Plaintiff decline to undergo traction, but agreed to additional testing. (*Id.*)

13. On July 14, 1994, Dr. Swajian determined the EMG was normal, but did not rule out radiculitis. (R. at 105.) Plaintiff exhibited small herniations ate L3-4 and L4-5, neurologic deficits with a slight diminution of reflex of the left lower extremity, and persistent pain at L4-5. (*Id.*) Dr. Swajian recommended a lumbar myelogram and CT scan with contrast. (*Id.*)

14. On July 27, 1994, Dr. Swajian noted that the lumbar myelogram and CT scan revealed a defuse annular bulge at L3-4 flattening the thecal sac, but not compressing the nerve roots, and a diffuse annular bulge at L4-5, more extensive on the left extending into the inferior neural foramina. (R. at 102.) Dr. Swajian felt that Plaintiff presented a case of radiculitis due to the bulging disc material, rather than nerve root compression, and recommended that Plaintiff undergo facet block injections. (*Id.*) Dr. Swajian noted that the only other option was surgical intervention, but rated the probability of success at only 50%. (R. at 102-103.) On August 12, 1994, Dr. Swajian recommended that Plaintiff try facet blocks before surgery, but Plaintiff insisted on proceeding to surgery. (R. at 101.)

15. On August 15, 1994, Dr. Swajian performed a laminectomy with excision of herniated nucleus pulposus at L4-5 on the left, and foraminotomy with exploration of the nerve root at L4 on the left. (R. at 96.) Plaintiff tolerated the procedure well and recovered without complication, other than persistent back pain. (R. at 97.)

16. One week post-surgery, Plaintiff was no longer experiencing pain in her left leg but still had paresthesias around her right ankle. (R. at 100.) Achilles reflexes were almost symmetrical.

(*Id.*) Dr. Swajian noted marked improvement from her pre-operative condition and opined that muscle wasting the thigh and calf area would resolve with time and activity. (*Id.*) Five weeks after the surgery, Plaintiff was still suffering from back pain, but her lower extremities were relatively asymptomatic. (R. at 99.) Dr. Swajian recommended that Plaintiff start a physical therapy program in about three weeks. (*Id.*)

17.     On March 14, 1995, Dr. Levitt noted that Plaintiff was exhibiting increasing tolerance to Percocet. (R. at 183.) Dr. Levitt prescribed Anexsia. (*Id.*) On April 20, 1995, Dr. Levitt noted that Plaintiff had been hospitalized due to a an accidental overdose of her daughter's Methadone that Plaintiff had taken after she ran out of her prescribed pain medication. (*Id.*) On June 14, 1995, Dr. Levitt noted that Plaintiff had persistent pain and had been taking MS Contin at night. (R. at 182.) On July 10, 1995, Plaintiff complained of dizziness and fainting spells, for which Dr. Levitt prescribed Meclizine. (*Id.*) On August 21, 1995, Plaintiff had run out of medication and was having withdrawal symptoms. (R. at 181.) Dr. Levitt prescribed Demerol and Vicodin (*Id.*)

18.     On September 7, 1995, Dr. Emmet Thorpe, M.D. performed a consultative examination. (R. at 138-141.) Plaintiff reported she had fallen five or six times after losing her balance and that she used a cane. (R. at 139.) Back pain was brought on and increased with sitting 30-35 minutes, standing 15-20 minutes or walking 15 minutes, with lifting 10 pounds or more. (*Id.*) Plaintiff settled her auto collision case in October 1994, but netted only $300 after payment of medical bills and attorney fees. (*Id.*) After the settlement, Plaintiff ceased receiving reimbursement for medical care. (*Id.*) In early 1995, Plaintiff was hospitalized for an accidental overdose of Methadone. (R. at 140.) Other than aching of the posterior thighs, Plaintiff had no complaints of radiculopathy or paresthesias. (*Id.*)

7

19. Upon examination, Plaintiff exhibited pain in her neck and the mid-low back. (*Id.*) She was able to walk on her heels/toes and squat satisfactorily. (*Id.*) Flexibility was impaired, but reflexes were normal. (*Id.*) After diagnosing failed low back surgery and residuals of sprain/strain of the neck, Dr. Thorpe concluded that Plaintiff was limited to lifting no more than ten pounds occasionally or 1-2 pounds frequently; no sitting, standing or walking for periods in excess of 30 minutes without being allowed to change position; no more than six hours sitting, four hours walking and three hours standing during an eight hour day. (R. at 141.)

20. Plaintiff's disability insured status expired on September 30, 1995. (R. at 236.)

21. On October 20, 1995, Dr. Levitt referred Plaintiff to the UNM pain clinic for stabilization of her pain. (R. at 143.) On November 16, 1995, Dr. Georgia Young examined Plaintiff at the pain clinic and diagnosed degenerative spine disorder and severe arthritis, ordered a CT scan and MRI, and suggested that Plaintiff stop taking Percocet due to the danger of liver damage. (R. at 144.) Plaintiff stated that she had migraine headaches and fell a lot due to weakness in her legs. (*Id.*) On November 20, 1995, Plaintiff reported that she was taking M.S. Contin for bedtime pain, Meclizine for dizziness, Percocet for pain, Formoxizide for swelling, Claritin for bronchitis, and Doxepin for sleep and depression. (R. at 145.)

22. On July 2, 1996, Plaintiff slipped and fell while shopping at Smith's, aggravating her back condition. (R. at 148.) On November 7, 1996, Plaintiff began treatment with Dr. R.E. Zuniga, M.D., a pain management specialist. (R. at 150.) Plaintiff was taking Methadone, Klonopin and Premarin. (*Id.*) Dr. Zuniga diagnosed failed back syndrome with re-injury and re-herniation of disc above the level of fusion. (R. at 151.) Plaintiff wished to be treated conservatively. (*Id.*) Dr. Zuniga suggested the implantation of a morphine pump or a spinal cord stimulator. (*Id.*)

23.     On November 8, 1996, a spinal anesthetic containing Morphine was injected, which temporarily alleviated her pain. (R. at 152.)  On November 21, 1996, Plaintiff received a caudal epidural steroid block. (R. at 153.)  Plaintiff continued to receive spinal anesthetics and Methadone on a regular basis.  (R. at 155-161.)

24.     On July 18, 1996, Dr. Levitt wrote that Plaintiff met "the Social Security Administration's requirements for disability" because she had "difficulty doing activities of daily living, and cannot do them at all unless she is medicated." (R. at 170.)  On July 30, 1996, Dr. Levitt checked "yes" on a social security disability questionnaire containing the wording of Social Security Listing 1.05C, indicating that Plaintiff satisfied the criteria of that listing and was therefore disabled. (R. at 174.)  Dr. Levitt further stated that Plaintiff cannot perform even sedentary work.  (*Id.*)

25.     On October 2, 1997, Dr. Zuniga completed a social security disability questionnaire. (R. at 162-165.)  Dr. Zuniga rated Plaintiff's ability to walk, sit and stand at significantly limited. (R. at 162.) Out of an with hour work day, she could sit stand and walk for zero hours. (R. at 163.)  She could occasionally lift up to ten pounds, could never reach, push or pull, or operate foot and leg controls. (*Id.*)  She could occasionally band, squat, kneel, kennel and crawl. (*Id.*)  Dr. Zuniga further stated that Plaintiff's subjective complaints were consistent with his objective findings, that Plaintiff's mental state had no bearing on the experience of symptoms, that she had complied with all treatment, and that her medication caused side effects.  (R. at 164.)  Based on his assessment, Dr. Zuniga concluded that Plaintiff was unable to perform work activity.  (R. at 165.)

26.     On March 1, 1999, Dr. Kimberly A. Levitt, D.O. wrote that she and Dr. William Levitt had treated Plaintiff since 1993 and that Plaintiff was disabled due to her post-laminectomy syndrome. (R. at 277.)

9

27. At the November 21, 1995 hearing, Plaintiff testified that she injured her back and neck in a car accident on March 26, 1994. (R. at 195.) After her August 1994 laminectomy, Plaintiff used a walker and a cane. (*Id.*) She was able to lift no more than ten pounds. (R. at 196-97.) Her pain medications helped, but they made her sleepy (R. at 199-200.) Plaintiff had stopped taking Percocet because it was bad for her liver. (R. at 200.)

28. Plaintiff was able to get along with people. (R. at 200-201.) Her 26-year-old daughter lived at home and took care of Plaintiff and the daughter's two children. (R. at 201.) Plaintiff was able to do light cooking, light shopping, light dusting, take short walks, read, crochet and knit. (R. at 201-202.) Plaintiff was able to walk about a block, but was unable to walk alone because she would fall. (R. at 202.) Her back pain worsened with cold weather. (R. at 205.)

29. Plaintiff would get up to make her husband's coffee when he went to work at 3:00 a.m. and then go back to bed until about 8:30 a.m. to 9:00 a.m. (R. at 206.) She needed help getting out of bed, but was able to do some light dusting and folding clothes. (R. at 207-208.) Plaintiff needed help getting out of the bathtub. (R. at 208.) Plaintiff would watch TV or nap in the afternoon. (*Id.*) Sometimes she would go out to lunch or dinner. (R. at 209.) Plaintiff had fallen several times and once she had to go to the emergency room. (R. at 209.) She used to walk a block to get the mail, but had stopped going for it due to her falls. (R. at 209-210.)

30. At the March 4, 1999 evidentiary hearing, Plaintiff appeared and was represented by Jane Craig, a non-attorney. (R. at 233.) Plaintiff testified that before her 1994 surgery, she had lower back pain, difficulty walking, and spasms. (R. at 240.) After the surgery, she felt a little relief, but in a few months, the pain came back. (*Id.*) With respect to the herniated discs from the 1996 slip and fall, Plaintiff testified that surgery had not been recommended due to the presence of scar tissue and

the lack of improvement from the 1994 surgery. (R. at 240.)

31.     Plaintiff's primary problems at the time of the hearing were chronic back pain, difficulty walking, swelling, and weakness in her legs. (R. at 240.) Before the slip and fall, Plaintiff had less severe chronic back pain. (R. at 241.) After the 1994 surgery, her pain in her lower back, right buttock and right leg returned in about three months. (*Id.*) Before and after the surgery, but before the expiration of her disability insured status, she was able to stand for about 20 minutes to half and hour. (R. at 243.) Before the surgery, she could sit up to an hour. (R. at 243-244.) After the surgery, but before the slip and fall, Plaintiff could sit for up to an hour and a half. (R. at 244.) About three or four months after the surgery, she started having the same symptoms as before the surgery. (*Id.*)

32.     Before the surgery, Plaintiff was unable to do her past work due to the chronic back pain, her inability to lift, and drowsiness caused by her pain medication. (R. at 245.) If she stood for more than an hour and a half, Plaintiff legs would swell. (R. at 246.) If she walked a couple of blocks home from church, her feet would swell. (*Id.*) Plaintiff had been using a cane since her surgery. (*Id.*) Sometimes her legs would give out and she would fall. (R. at 247.) She was able to pick something up off the floor with difficulty and could lift up to ten pounds. (*Id.*) Plaintiff also testified that she had developed arthritis in her hands and back. (R. at 250.)

33.     After the second decision, Plaintiff submitted records for the University of New Mexico Hospital dated March 9, 2000, stating that she had been diagnosed with bilateral degenerative joint disease of the thumbs. (R. at 214-216.)

**Discussion**

34.     Plaintiff contends that the ALJ erred in his step three determination, erred in

11

disregarding the opinions of the treating physicians, erred in his credibility determination, and erred in his step four determination given Dr. Thorpe's opinion that she showed a potential problem in sustaining positions of her neck in reading and doing detail work.

35.     Plaintiff contends that the ALJ erred by finding that she was not disabled at step three, because she meets the criteria of the listing for impairments for spinal injuries, 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.05C.  A claimant is presumed to be disabled under listing 1.05C,  if she has a herniated disc, spinal stenosis, or other vertebrogenic disorder and persistent "[p]ain, muscle spasm, and significant limitation of motion in the spine," along with "[a]ppropriate radicular distribution of significant motor loss with muscle weakness and sensory and reflex loss" for at least three months despite prescribed therapy, that is expected to last twelve months. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.05C.

36.     In this case, the ALJ determined that Plaintiff was not disabled under Section 1.05C because prior to her date last insured, September 30, 1995, Plaintiff had "normal reflexes, normal sensation and normal motor function . . ." (R. at 226.)  Plaintiff argues that this conclusion was not supported by substantial evidence.  (Pl's Br. at 2-3.)   Plaintiff cites to evidence of diminished reflexes, abnormal sensation and paresthesias before her August 14, 1994 surgery, (Pl's Br. at 2-3), and evidence of slight paresthesias, burning sensation and weakness during the months following the surgery.  (R. at 99; 100; 128; 132.)

37.     In addition, one week post-surgery, Plaintiff had paresthesias around her right ankle but Achilles reflexes were almost symmetrical. (R. at 100.)  Five weeks after the surgery, Plaintiff was still suffering from back pain, but her lower extremities were relatively asymptomatic. (R. at 99.)  On October 21, 1994, Plaintiff was having difficulty walking. (R. at 116.)  On November 3, 1994, Dr.

12

Levitt observed bilateral hip and sacral dysfunction. (R. at 115.) Dr. Levitt noted that Plaintiff fell on January 3, 1995, January 17, 1995 and February 14, 1995, each time aggravating her condition. (R. at 113-114.) On March 14, 1995 and April 20, 1995, Dr. Levitt observed decreased range of motion and muscle spasm throughout her back. (R. at 183.) On July 25, 1995, Dr. Levitt noted that Plaintiff was ambulating with a cane. (R. at 182.) On September 7, 1995, Dr. Thorpe observed "segmental restriction or lumbar spine motion on right lateral bend and a significant list on flexion combined with a restricted range of motion. (R. at 140.) This evidence indicates that Plaintiff continued to suffer persistent pain, muscle spasm, and significant limitation of motion in the spine, along with significant motor loss with muscle weakness and reflex loss after her surgery and before the date last insured.

38. The record also contains evidence tending to support the ALJ's determination. Dr. Thorpe noted that Plaintiff had normal reflexes, sensation and motor power in her lower extremities. (R. at 140.) Plaintiff's Adson's, Phalen's, Tinel's, femoral nerve, and Fabere's testings were negative, she could perform straight leg raises to 80 degrees without pain, she could walk on her heels and toes. (*Id*.) On October 3, 1995, Dr. Levitt noted that Plaintiff's neurological examination was intact. (R. at 180.) Thus, the record contains conflicting evidence on the crucial issue of whether Plaintiff satisfied Section 1.05C before her date last insured.

39. The ALJ failed to address and resolve this conflict in his step three analysis. This was error. At step three, the ALJ is "required to discuss the evidence and explain why he found that appellant was not disabled." *Clifton v. Chater*, 79 F. 3d 1007, 1009 (10th Cir.1996). The ALJ must make findings supported by specific weighing of the evidence. *See id*. In addition to discussing the evidence supporting his decision, the ALJ must also discuss the uncontroverted evidence he chooses

13

not to rely upon, as well as significantly probative evidence he rejects. *See Clifton*, 79 F.3d at 1009-1010 (citing *Zblewski v. Schweiker*, 732 F. 2d 75, 79 (7th Cir. 1984)) ("a minimal level of articulation of the ALJ's assessment of the evidence is required in cases in which considerable evidence is presented to counter the agency's position.") The record in Plaintiff's case contains considerable evidence of paresthesias, abnormal reflexes, and weakness during the period between Plaintiff's surgery and the expiration of her insured status. (R. at 99; 100; 128; 132.) The ALJ failed to set out specific findings and reasons for rejecting this evidence at step three. On remand, the ALJ should set out specific findings and reasoning with regards to the issue of whether Plaintiff satisfied the criteria of Section 1.05C on or before September 30, 1995.

40. Plaintiff argues that the ALJ erred in disregarding the opinions of her treating physicians. On July 18, 1996, Dr. Levitt wrote that Plaintiff met "the Social Security Administration's requirements for disability" because she had "difficulty doing activities of daily living, and cannot do them at all unless she is medicated." (R. at 170.) On July 30, 1996, Dr. Levitt indicated that Plaintiff met the criteria of Section 1.05C and that Plaintiff cannot perform even sedentary work. (R. at 174.) On October 2, 1997, Dr. Zuniga concluded that Plaintiff was unable to perform work activity. (R. at 165.) On March 1, 1999, Dr. Kimberly A. Levitt, D.O. wrote that Plaintiff had been under her care and Dr. William Levitt's care since 1993 and that Plaintiff was disabled due to her post-laminectomy syndrome. (R. at 277.)

41. The ALJ disregarded these opinion because they "address her condition two years later and the record document a significant deterioration in the intervening period." (R. at 227.) A treating physician may offer an opinion which reflects a judgment about the nature and the severity of a claimant's impairments. *See Castellano v. Secretary*, 26 F. 3d 1027, 1029 (10th Cir. 1994). The

ALJ must give controlling weight to this type of opinion if it is well supported by clinical and laboratory diagnostic techniques and it is not inconsistent with other substantial evidence in the record.  *See id.*  However, a treating physician's opinion is not dispositive on the issue of disability because final responsibility for determining the ultimate issue of disability rests with the Commissioner. *Id.*

42. In assessing proper weight to accord the opinion of a treating physician the ALJ must evaluate the degree to which the physician's opinion is supported by relevant evidence, the consistency between the opinion and the record as a whole, and other factors brought to the ALJ's attention which tend to support or contradict the opinion.  *See Goatcher v. Shalala*, 52 F. 3d 288, 290 (10th Cir. 1995).  In this case, the ALJ disregarded the physicians' opinions because he believed they did not relate to the relevant time period.  However, the opinions do not contain such a time limitation.  Drs. Levitt and Levitt had been treating Plaintiff since 1993 and their opinions encompass the relevant period.  Dr. Zuniga treated Plaintiff for chronic and persistent back pain; a condition with its genesis in the March 1994 auto collision.  While it is true that Plaintiff condition was aggravated by her July 2, 1996 slip and fall, it was inappropriate for the ALJ to completely disregard the physicians' opinions because they treated her subsequent to the date last insured.  On remand, the ALJ should re-evaluate the opinions of Plaintiff's treating physicians in accordance with *Goatcher* and *Castellano.*

43. Plaintiff asserts that the ALJ erred in assessing her credibility.  "Credibility determinations are peculiarly the province of the finder of fact," and will not be overturned if supported by substantial evidence.  *Diaz v. Secretary of Health & Human Servs.*, 898 F.2d 774, 777 (10th Cir.1990).  Plaintiff established that she suffers from a pain-producing impairment.  Therefore,

the ALJ was required to consider her complaints of pain by evaluating her use of pain medication, her attempts to obtain relief, the frequency of her medical contacts, and the nature of her daily activities, as well as subjective measures of credibility including the consistency or compatibility of non-medical testimony with the objective medical evidence.  *See Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir.1995).

44.     The ALJ failed to fully consider the *Kepler* factors in assessing Plaintiff's credibility. The ALJ referred to Plaintiff's daily activities, touched on the medical records with respect to her pain complaints, and mentioned that she had been taking Percocet. (R. at 227.) The ALJ then inexplicitly states "[s]he says that she has had muscle spasms since the car accident in 1994, but the medical record makes no mention of the symptoms prior to her date last insured." (R. at 227.) This statement is wholly unsupported by the record, which in fact documents muscle spasms and sensory deficits prior to the expiration of her insured status. (R. at 99; 100; 115; 116; 179; 180; 181; 182; 183.) The ALJ failed to mention Plaintiff's August 1994 surgery, her June 1994 epidural injections, her use of a walker and cane, and her use of Methadone, Demerol, Vicodin and MS Contin prior to September 30, 1995. (R. at 181.) On remand, the ALJ should analyze Plaintiff's pain complaints in accordance with all the requirements of *Kepler*.

45.     Plaintiff contends that the ALJ erred in findings that she was able to perform her past relevant work as a dental receptionist and secretary, and erred in finding that she had the capacity to perform the substantially the full range of sedentary work. In reaching his conclusion, the ALJ relied on Dr. Thorpe's consultative report. (R. at 227.) However, the ALJ failed to include Dr. Thorpe's proviso that Plaintiff would have difficulty "sustaining positions of the neck as with protracted reading or doing detail work." (R. at 141.)

46.     Step four of the sequential analysis is comprised of three phases.  *See Winfrey v. Chater*, 92 F. 3d 1017, 1023 (10th Cir. 1996).  In the first phase, the ALJ must evaluate a claimant's physical and mental residual functional capacity.  *See id.* (*citing Henrie v. U. S. Dept of Health & Human Servs.*, 13 F. 3d 359, 361 (10th Cir. 1993)).  In the second phase, the ALJ must determine the physical and mental demands of the claimant's past relevant work.  *See id.*  In the final phase, the ALJ determines whether the claimant has the ability to meet the job demands found in phase two despite the mental and/or physical limitations found in phase one.  *See id*.

47.     On remand, the ALJ should also review the second phase of the step four analysis, in the event the analysis proceeds beyond step three.  At the second phase of the step four analysis, the ALJ must make findings regarding the physical and mental demands of the claimant's past relevant work.  To make necessary findings, the ALJ must obtain adequate "factual information about those work demands which have a bearing on the medically established limitations." *Winfrey v. Chater*, 92 F. 3d 1017, 1023. On remand, the ALJ should make inquiry into and findings specifying the physical and mental demands of Plaintiff past relevant work, either as Plaintiff actually performed the work or as it is customarily performed in the national economy.  Because this matter is remanded, the Court need not address the third phase of the step four inquiry under *Winfrey*.  On remand, if Plaintiff is not found to be disabled at step three, the Commissioner should complete the step four analysis, and proceed to step five, if appropriate.

## RECOMMENDED DISPOSITION

I recommend that Plaintiff's Motion to Reverse and Remand for a Rehearing, (Doc. 13), be granted and that this matter be remanded to the Commissioner for specific findings and reasoning with regards to the issue of whether Plaintiff satisfied the criteria of Section 1.05C on or before

September 30, 1995, re-evaluation of the opinions of Plaintiff's treating physicians in accordance with *Goatcher* and *Castellano,* analysis of Plaintiff's pain complaints in accordance with *Kepler,* and, if Plaintiff is not found to be disabled at step three, completion of all three phases of the *Winfrey* step four analysis, as well as the step five analysis, if appropriate.

Timely objections to the foregoing may be made pursuant to 28 U.S.C. §636(b)(1)(C). Within ten days after a party is served with a copy of these proposed findings and recommendations that party may file with the Clerk of the District Court written objections to such proposed findings and recommendations. A party must file any objections within the ten day period allowed if that party wants to have appellate review of the proposed findings and recommendations. If no objections are filed, no appellate review will be allowed.

_____
**LESLIE C. SMITH**
**UNITED STATES MAGISTRATE JUDGE**